United States District Court
Southern District of Texas

**ENTERED**

June 23, 2016

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SANJOY SARKAR,                            §
                                          §
            Plaintiff,                    §
                                          §
v.                                        §
                                          §     CIVIL ACTION NO. H-15-2372
PETROLEUM COMPANY OF                      §
TRINIDAD & TOBAGO LIMITED                 §
and HRC & ASSOCIATES                      §
MANAGEMENT CONSULTANTS,                   §
                                          §
            Defendants.                   §

## MEMORANDUM OPINION AND ORDER

Plaintiff Sanjoy Sarkar ("Sarkar" or "Plaintiff") brought this action against defendants Petroleum Company of Trinidad & Tobago Limited ("Petrotrin") and HRC Associates Limited ("HRC") (together, "Defendants") on August 17, 2015.[1]  Pending before the court are Defendant Petroleum Company of Trinidad and Tobago Limited's Motion to Dismiss Sanjoy Sarkar's Amended Complaint and Supporting Memorandum of Law ("Petrotrin's Motion to Dismiss") (Docket Entry No. 13) and Defendant HRC Associates Limited's Motion to Dismiss Sanjoy Sarkar's Amended Complaint and Supporting Memorandum of Law ("HRC's Motion to Dismiss") (Docket Entry No. 14).[2]

---

[1] See Plaintiff Sanjoy Sarkar's Original Complaint ("Original Complaint"), Docket Entry No. 1.

[2] HRC was "incorrectly named as HRC & Associates Management Consultants."  See HRC's Motion to Dismiss, Docket Entry No. 14, p. 5.

## I.   Background

Sarkar is an experienced executive working in the oil and gas industry and a United States citizen.[3]   Sarkar alleges the following facts.   Petrotrin is a limited liability company incorporated under the laws of the Republic of Trinidad and Tobago ("T & T") with its principal place of business in Pointe-a-Pierre, T & T.[4] The T & T government owns and operates Petrotrin under the direction of the T & T Ministries of Finance and Energy.[5] Petrotrin produces, refines, and sells petroleum products in the United States, Latin America, and other portions of the Caribbean, and "engages in hiring and recruiting employees, hiring of service providers, entry into joint ventures and securing financing from the United States . . . ."[6]   HRC is a recruiting and consultant firm based in T & T.[7]   Petrotrin uses HRC as an agent to headhunt and recruit employees from the United States and other locations around the world.[8]   "HRC, as an agent on behalf of Petrotrin, actively seeks Americans for employment with its principal

---

[3]See Plaintiff Sanjoy Sarkar's Amended Complaint ("Amended Complaint"), Docket Entry No. 12, p. 1 ¶ 2.

[4]See id. at 2 ¶ 3.

[5]See id.

[6]See id. at 2 ¶ 3; 3 ¶ 11; 8 ¶¶ 29-32.

[7]See id. at 2 ¶ 4; 8-9 ¶¶ 32-33.

[8]See id. at 2 ¶ 4.

Petrotrin including by visiting prospects in the United States, interviewing prospects, and negotiating employment packages while in the US."[9]  Khalid Hassanali was President and Keith Ramnath was Vice President of Petrotrin at the time of the events leading to this action.[10]  Hollick Rajkumar was and remains the managing director of HRC.[11]

Around October of 2014 HRC contacted Sarkar, and Sarkar interviewed for an executive level position with Petrotrin.[12]  HRC originally contacted him for the CFO position at Petrotrin.[13]  HRC contacted him again, and Sarkar applied for and was offered the position of Vice President, Marketing, Trading and Business Development ("Vice President Marketing").[14]  Petrotrin sent a draft contract to Sarkar on December 10, 2014, while he was in the United States.[15]  Both Defendants were aware that Sarkar was a U.S.

---

[9]Id. at 8-9 ¶ 32.

[10]Id. at 2 ¶¶ 5, 6.  Neither is a party to this action.

[11]Id. at 2 ¶ 7.  Rajkumar is not a party to this action.

[12]See id. at 3 ¶ 12; 9 ¶ 36.

[13]See id. at 3-4 ¶ 12; 9 ¶ 36 (this contact was in the form of a public LinkedIn advertisement on the internet to which Sarkar responded).  Ronald Huff, also a Texas resident, was ultimately hired as CFO.  See Amended Complaint, Docket Entry No. 12, p. 5 ¶ 20.

[14]See Amended Complaint, Docket Entry No. 12, pp. 3-4 ¶¶ 12, 15; p. 9 ¶ 36.

[15]See id. at 4 ¶ 16; 10 ¶ 37.

citizen living in the U.S. at the time.[16]  Sarkar and Petrotrin engaged in negotiations via phone and email, and Sarkar signed the Contract of Service (the "Contract") in the United States on December 12, 2014.[17]  Sarkar's wife witnessed his signature.[18]

The Contract commenced on January 19, 2015, and was for a four-year term, unless terminated earlier pursuant to the Contract terms.[19]  The Contract stated that upon termination by Petrotrin for any reason except "termination for cause" as defined in Clause 21 of the Contract, Petrotrin would owe Plaintiff fifty percent of the remaining value of the monthly remuneration (basic salary, traveling allowance, gratuity, medical allowance, and housing allowance) due to the end of the contractual term (the "Termination Payment").[20]  Unless it was terminated for cause, the Contract would

---

[16]See id. at 4 ¶ 13.

[17]See id. at 4 ¶ 16; 10 ¶ 37.  Contract, Exhibit 1 to Amended Complaint, Docket Entry No. 12-1, p. 4.

[18]See Amended Complaint, Docket Entry No. 12, p. 10 ¶ 37. Contract, Exhibit 1 to Amended Complaint, Docket Entry No. 12-1, p. 4.  She is also a United States citizen and resides in Texas.

[19]See Amended Complaint, Docket Entry No. 12, p. 10 ¶ 38.  But see Contract, Exhibit 1 to Amended Complaint, Docket Entry No. 12-1, p. 1 ¶ 3 ("This Contract will commence on 2015 January 19 or such date granted as per Work Permit Approval. . . .").

[20]See Amended Complaint, Docket Entry No. 12, p. 10 ¶ 39; Contract, Exhibit 1 to Amended Complaint, Docket Entry No. 12-1, p. 3 ¶ 20.  "Termination for cause" is defined in Clause 21 of the Contract as one of the following acts or omissions committed by Sarkar: (i) non-performance, (ii) breach of fiduciary duty, (iii) gross default or misconduct, (iv) an act of dishonesty, (v) fraud or misrepresentation, or (vi) breach of the terms and
(continued...)

only terminate upon payment of the Termination Payment.[21]  Sarkar's compensation is stated in terms of both T & T and U.S. dollars throughout the Contract.[22]  As part of his compensation package, Petrotrin offered to pay for Sarkar's flights back to the United States.[23]

The first numbered paragraph of the Contract states that "[y]our employment is contingent on you obtaining a **Work Permit**."[24] After the Contract was executed, Sarkar submitted supporting documentation for his work permit application and the list of references "while in the United States."[25]  HRC's managing director, Hollick Rajkumar, told Sarkar verbally that the work permit process was a "mere formality" for prospective employees of Petrotrin.[26]

---

[20](...continued)
conditions stipulated herein.  <u>See</u> Contract, Exhibit 1 to Amended Complaint, Docket Entry No. 12-1, p. 3 ¶ 21.

[21]<u>See</u> Amended Complaint, Docket Entry No. 12, p. 10 ¶ 39; Contract, Exhibit 1 to Amended Complaint, Docket Entry No. 12-1, p. 3 ¶ 20.

[22]<u>See</u> Amended Complaint, Docket Entry No. 12, pp. 5-6 ¶ 10 (citing Contract, Exhibit 1 to Amended Complaint, Docket Entry No. 12-1, pp. 1-2 ¶¶ 6, 8, 10, 12, 13, 16).

[23]<u>See</u> <u>id.</u> at 7 ¶ 26.

[24]Contract, Exhibit 1 to Amended Complaint, Docket Entry No. 12-1, p. 1 ¶ 1.

[25]<u>See</u> Amended Complaint, Docket Entry No. 12, p. 4 ¶ 17.

[26]<u>See</u> <u>id.</u> at 13 ¶ 50.  In a December 29, 2014, email Rajkumar stated that the work permit would be taken care of that week and that "there was no need to worry." This email is not attached to
(continued...)

There were delays in processing the application, but during this time Mr. Huff, a United States citizen residing in Texas and the person Petrotrin hired for the CFO position, met with Sarkar in Texas.[27]  Petrotrin also arranged two trips to T & T for Sarkar, including a trip with his family.[28]

Sarkar alleges that the contract commenced on January 19, 2015, and he was available to work from that date, communicating the same to Defendants.[29]  Sarkar followed up with Petrotrin for days before and after that date, requesting details on his and his family's move to T & T and an update on his work permit status.[30]  On January 7, 2015, Sarkar emailed Petrotrin to ask if he could commence working for Petrotrin in the U.S. and T & T while his work permit application was pending.[31]  As an amendment to the Contract, Petrotrin's president agreed by email that Sarkar could begin working on a "consultant" basis.[32]  However, Petrotrin's vice

---

[26](...continued)
the Amended Complaint or Sarkar's other pleadings.  See footnote 124, infra.

[27]See Amended Complaint, Docket Entry No. 12, p. 5 ¶ 20.  Huff allegedly "advised Mr. Sarkar on possible ways forward with the pending work permit issues" and told Sarkar that "his position (if not his name) had been mentioned in various road show presentations made by Petrotrin to financial institutions at this time."

[28]See id. at 5 ¶ 21.

[29]See id. at 10-11 ¶¶ 41-43.

[30]See id. at 11 ¶ 42.

[31]See id. at 9 ¶ 35; 11 ¶ 43.

[32]See id.

president withdrew the amendment via email dated January 14, 2015, while the work permit was under consideration.[33]

On January 30 Hassanali notified Sarkar in writing that the Ministry of National Security of T & T had not issued Sarkar a work permit "purportedly after its meeting on or about January 23, 2015, and accordingly this condition of the Contract could not be attained (and thus enforcement of the Contract was not possible)."[34] The letter stated "for the 'avoidance of doubt', that [Petrotrin] had unilaterally discharged the Contract and released the parties from their obligations thereunder."[35]

After terminating the Contract, Petrotrin refused to pay the Termination Payment, contending that the failure to obtain a work permit resulted in an unenforceable Contract.[36] Sarkar alleges that Petrotrin is required to pay him the Termination Payment in order to terminate the Contract, since none of the enumerated for-cause termination situations occurred.[37]   Sarkar also alleges that Defendants failed to follow the proper work permit application process because they did not advertise in local T & T newspapers or conduct a full public solicitation.[38]   In the recruiting agreement

---

[33]See id. 2 ¶ 6; 11 ¶ 44.

[34]See id. at 11 ¶ 45.

[35]See id.

[36]See id. at 11-12 ¶¶ 46-49.

[37]See id. at 11-12 ¶ 46.

[38]See id. at 13 ¶ 51.

between HRC and Petrotrin, HRC was responsible for, among other things, placing advertisements in local newspapers.[39]   HRC's managing director admitted in an email that it failed to advertise Sarkar's position because it had mistakenly assumed that an earlier advertisement for the CFO position would be sufficient.[40]   Petrotrin asked HRC to send a letter addressing this issue, but it appears HRC failed to take corrective action.[41]   Due to Defendants failure to follow "well-established protocol, the Ministry of National Security appears to have turned down Petrotrin's application for a work permit initially for [Sarkar]."[42]

Later, HRC told Sarkar that Petrotrin's board had requested that Mr. Ramnath reapply for Sarkar's work permit, but Petrotrin changed its mind again and refused both to correct its initial application and to lodge a fresh application.[43]   Petrotrin also refused Sarkar's offer to work as a consultant or remotely from Houston while the work permit process was ongoing.[44]   Sarkar alleges

---

[39]Id.

[40]Id. at 13 ¶ 52.  Sarkar had also applied for the CFO position. Id.

[41]Id.  "Ostensibly, HRC and Petrotrin's failure to place the advertisement was the reason that the Ministry did not approve the work permit for Plaintiff."  Id. ¶ 53.

[42]See id. at 14 ¶ 54.

[43]See id. ¶ 55.

[44]See id.

that the work-permit issue is a pretext "for not going forward with [Sarkar's] employment."[45]

Sarkar filed his Original Complaint on August 17, 2015.[46]  At the initial scheduling conference Sarkar was given leave to amend, and the parties were directed to complete discovery on jurisdictional issues by March 4, 2016.[47]  Sarkar filed his Amended Complaint on March 11, 2016, asserting a claim for breach of contract against Petrotrin and claims for negligence and negligent misrepresentation against both Defendants.[48]  Defendants filed the two motions to dismiss on April 1, 2016.[49]

## II.   Objections to Defendants' Declarations Filed in Support of the Motions to Dismiss

Sarkar objects to three declarations filed in support of Defendants' motions:  (1) Declaration of Radica Maraj Adharsingh in Support of Defendants Petroleum Company of Trinidad and Tobago Limited and HRC Associates Limited's Motions to Dismiss

---

[45]See id. ¶ 56.  Sarkar's theory is that the drastic drop in the price of crude oil around the time of his start date caused Petrotrin to need to quickly cut expenses.  Id. ¶ 57.  As of the date of filing, no one had been hired for the position.  See id. at 15 ¶ 58.

[46]Original Complaint, Docket Entry No. 1.

[47]See Minutes and Order for December 18, 2015, Hearing, Docket Entry No. 11.

[48]See Amended Complaint, Docket Entry No. 12, pp. 15-20.

[49]Petrotrin's Motion to Dismiss, Docket Entry No. 13; HRC's Motion to Dismiss, Docket Entry No. 14.

("Adharsingh Declaration");[50] (2) Declaration of Ronald Huff in Support of Defendant Petroleum Company of Trinidad and Tobago Limited's Motion to Dismiss ("Huff Declaration");[51] and (3) Declaration of Hollick Rajkumar in Support of Defendant HRC Associates Limited's Motion to Dismiss ("Rajkumar Declaration").[52] Sarkar moves to strike the declarations because they are not in compliance with 28 U.S.C. § 1746, or, alternatively, because portions of the declarations are otherwise inadmissible under the Federal Rules of Evidence.[53]

---

[50]Exhibit A to Petrotrin's Motion to Dismiss, Docket Entry No. 13-2; Exhibit B to HRC's Motion to Dismiss, Docket Entry No. 14-3.

[51]Exhibit B to Petrotrin's Motion to Dismiss, Docket Entry No. 13-3.

[52]Exhibit A to HRC's Motion to Dismiss, Docket Entry No. 14-2.

[53]See Plaintiff's Objections to Defendants' Declarations Filed in Support of Their Motions to Dismiss ("Plaintiff's Objections"), Docket Entry No. 15. 28 U.S.C. § 1746(1) provides:

> Wherever, under any law of the United States . . . any matter is required or permitted to be supported . . . by the sworn declaration . . . in writing of the person making the same . . . such matter may, with like force and effect, be supported . . . by the unsworn declaration . . . in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:
>
> (1) If executed without the United States:  "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on (date). (Signature)".

## A.   Compliance With 28 U.S.C. § 1746

The originally submitted declarations state: "I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief."[54]   Defendants contend that this satisfies the "substantially in the following form" requirement of the statute.[55]   Nonetheless, Defendants have submitted declarations that quote 28 U.S.C. § 1746(1)'s language and are otherwise identical to the originally submitted declarations, mooting Sarkar's first objection.[56]

## B.   Sarkar's Other Objections

Sarkar objects to portions of the declarations on the following grounds:   lack of personal knowledge, conclusory statements, hearsay statements, and impermissible expert

---

[54]See Adharsingh Declaration, Exhibit A to Petrotrin's Motion to Dismiss, Docket Entry No. 13-2, p. 6 ¶ 23; Huff Declaration, Exhibit B to Petrotrin's Motion to Dismiss, Docket Entry No. 13-3 p. 3 ¶ 8; Rajkumar Declaration, Exhibit A to HRC's Motion to Dismiss, Docket Entry No. 14-2, p. 6 ¶ 23.

[55]See Defendants Petroleum Company of Trinidad and Tobago Limited and HRC Associates Limited's Response to Plaintiff's Objections to and Motion to Strike Declarations filed in Support of Defendants' Motion to Dismiss, Docket Entry No. 20.

[56]See Exhibit F to Defendant Petroleum Company of Trinidad and Tobago Limited's Reply in Support of Its Motion to Dismiss Sanjoy Sarkar's Amended Complaint ("Petrotrin's Reply in Support"), Docket Entry No. 18-2; Exhibit G to Petrotrin's Reply in Support, Docket Entry No. 18-3; Exhibit C to Defendant HRC Associates Limited's Reply in Support of Its Motion to Dismiss Sanjoy Sarkar's Amended Complaint ("HRC's Reply in Support"), Docket Entry No. 19-2; Exhibit D to HRC's Reply in Support, Docket Entry No. 19-3.

testimony.[57]  To the extent that the declarations contain statements based on "information and belief" that are inadmissible because they are not based on personal knowledge or because they contain hearsay, the court has not relied on those statements.[58]

Other objections are to statements that are irrelevant to the bases of the court's decision.[59]  For example, Sarkar makes several objections to inadmissible expert testimony in Adharsingh's Declaration, but these statements on the judicial system of T & T pertain to the _forum_ _non_ _conveniens_ arguments, which the court does not reach.[60]  To the extent the declarations contain otherwise

---

[57]See Plaintiff's Objections, Docket Entry No. 15, pp. 2-3 (citing Federal Rules of Evidence 602, 401 and 701, 801 and 802, and 702, respectively).

[58]See _id._ at 3.  Rajkumar is the founder and Managing Director of HRC and based his declaration upon personal knowledge and a review of HRC's business records.  See Rajkumar Declaration, Exhibit A to HRC's Motion to Dismiss, Docket Entry No. 14-2, p. 2 ¶ 1.  Adharsingh is Senior Manager, Law and Land Management for Petrotrin.  See Adharsingh Declaration, Exhibit A to Petrotrin's Motion to Dismiss, Docket Entry No. 13-2, p. 2 ¶ 1.  She is licensed to practice law in T & T and has been practicing there for 24 years, and describes her role at Petrotrin as "directing Petrotrin in its legal affairs and compliance matters." _Id._  Her declaration is based upon "personal knowledge and a review of Petrotrin's business records." _Id._  Sarkar does not contest either declarant's role at the respective companies.  Hearsay statements are admissible if they fall into a recognized exception category, such as records of a regularly conducted activity.  See Fed. R. Evid. 803(6); Morris v. B.C. Olympiakos, SFP, 721 F. Supp. 2d 546, 550-52 (S.D. Tex. 2010).

[59]Sarkar objects to Adharsingh's "misstatements" of the Trinidad & Tobago Employment Act and the Contract, but both are attached to the pleadings and available for the court to review without relying on Adharsingh's Declaration.  See Plaintiff's Objections, Docket Entry No. 15, p. 3.

[60]See Adharsingh Declaration, Exhibit A to Petrotrin's Motion to Dismiss, Docket Entry No. 13-2, p. 4 ¶¶ 11-13.

impermissible or inadmissible material, the court has not relied on them in reaching its decision.[61]

### III.  Petrotrin's Motion to Dismiss

Petrotrin argues that the court should dismiss the Amended Complaint because Petrotrin is immune from suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, et seq.[62] Sarkar responds that the court has jurisdiction under the FSIA because Petrotrin implicitly waived sovereign immunity and because the "commercial activity" exception to immunity applies.[63]

### A.  Standard of Review

Foreign states and their agencies and instrumentalities are immune from suit in the courts of the United States except as

---

[61]Some of the objections are to paragraphs containing largely uncontested facts.  For instance, Sarkar objects to statements prefaced with the phrase "upon information and belief," but one such statement is that "on or around November 2014, Sarkar engaged in discussions with HRC regarding potential employment as Petrotrin's [Vice President Marketing]."  See Adharsingh Declaration, Exhibit A to Petrotrin's Motion, Docket Entry No. 13-2, p. 3 ¶ 5.  Sarkar alleges that "Petrotrin and HRC actively recruited Sarkar in Houston, Texas in order to enter into an employment contract in late 2014 with Petrotrin."  Amended Complaint, Docket Entry No. 12, p. 3 ¶ 12.

[62]Petrotrin's Motion to Dismiss, Docket Entry No. 13, pp. 11-20.  Alternatively, Petrotrin argues that the court should dismiss the Amended Complaint in favor of adjudication in T & T pursuant to the doctrine of forum non conveniens.  Id. at 20-29.  Because the court concludes that dismissal is required by the FSIA, it does not reach Petrotrin's alternative argument.

[63]See Plaintiff's Response to Defendant Petroleum Company of Trinidad & Tobago Limited's Motion to Dismiss ("Plaintiff's Response to Petrotrin's Motion"), Docket Entry No. 17, pp. 4, 9-18.

otherwise provided in the FSIA.  <u>See</u> 28 U.S.C. § 1604; <u>Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines</u>, 965 F.2d 1375, 1383 (5th Cir. 1992); <u>Saudi Arabia v. Nelson</u>, 113 S. Ct. 1471, 1476 (1993) ("Under the Act, a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state.").  The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country.  <u>OBB Personenverkehr AG v. Sachs</u>, 136 S. Ct. 390, 393 (2015) (quotations omitted) (citing <u>Argentine Republic v. Amerada Hess Shipping Corp.</u>, 109 S. Ct. 683, 693 (1989)).  "[B]oth statutory subject matter jurisdiction . . . and personal jurisdiction turn on application of the substantive provisions of the [FSIA]."  <u>Verlinden B.V. v. Central Bank of Nigeria</u>, 103 S. Ct. 1962, 1967 n.5 (1983).[64]

The party claiming FSIA immunity has the ultimate burden of persuasion.  <u>In re B-727 Aircraft</u>, 272 F.3d at 271 (citing <u>Kelly v. Syria Shell Petroleum Development B.V.</u>, 213 F.3d 841, 847 (5th

---

[64]Under 28 U.S.C. § 1330(a), federal district courts have subject matter jurisdiction if a foreign state is "'not entitled to immunity either under sections 1605-1607 . . . or under any applicable international agreement.'" <u>See</u> <u>Verlinden</u>, 103 S. Ct. at 1967 n.5.  Personal jurisdiction exists under § 1330(b) wherever subject matter jurisdiction exists under subsection (a) and service of process has been made under § 1608 of the FSIA.  <u>Id.</u>  "Thus, if none of the exceptions to sovereign immunity set forth in the Act applies, the District Court lacks both statutory subject matter jurisdiction and personal jurisdiction."  <u>Id.</u>; <u>see also</u> <u>In re B-727 Aircraft Serial No. 21010</u>, 272 F.3d 264, 270 (5th Cir. 2001).

Cir.), cert. denied, 121 S. Ct. 426 (2000)).  However, the party
claiming immunity need only present a prima facie case that it is
a foreign state.  Id.  Once it does, the burden shifts to the party
opposing immunity to present evidence that an exception to immunity
applies.  Id.; see Walter Fuller, 965 F.2d at 1383.  Sarkar
concedes that Petrotrin is an agency or instrumentality of a
foreign state within the meaning of the FSIA.[65]  See 28 U.S.C.
§ 1603(a), (b).  In determining whether an exception applies, a
district court may rely on the pleadings and consider conflicting
evidence — contained in affidavits, for example — and make its own
resolution of disputed jurisdictional facts in determining whether
it has subject matter jurisdiction.  See Forsythe v. Saudi Arabian
Airlines Corp., 885 F.2d 285, 289 n.6 (5th Cir. 1989) (citing
Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir.), cert. denied,
102 S. Ct. 396 (1981)).

**B.   Waiver**

"A foreign state shall not be immune from the jurisdiction of
courts of the United States or of the States in any case . . . in
which the foreign state has waived its immunity either explicitly
or by implication . . . ."  28 U.S.C. § 1605(a)(1).  Although the
Contract does not contain an explicit waiver, Sarkar argues that
Petrotrin "implicitly waived its claim to sovereign immunity on the

---

[65]See Amended Complaint, Docket Entry No. 12, p. 2 ¶ 8.

basis that it agreed to apply US laws to the Contract[.]"[66] Sarkar argues that the Contract obligates Sarkar to comply with U.S. tax laws in his employment in T & T, and Petrotrin "agreed to pay a gross-up for compensation if Mr. Sarkar was required to pay additional taxes in the United States arising from his taxation under the laws of T&T in relation to the agreement."[67]

Implicit waiver is narrowly construed, and "courts rarely find that a nation has waived its sovereign immunity without strong evidence that this is what the foreign state intended." Rodriguez v. Transnave Inc., 8 F.3d 284, 287 (5th Cir. 1993). "The legislative history of the FSIA states that implicit waivers are ordinarily found in three situations: (1) a foreign state agrees to arbitration in another country; (2) the foreign state agrees that a contract is governed by the laws of a particular country; or (3) the state files a responsive pleading without raising the immunity defense." Id. (citations omitted). Courts are reluctant to stray beyond these three examples when considering claims that a nation has explicitly waived its sovereign immunity defense. Id. (citing Frolova v. Union of Soviet Socialist Republics, 761 F.2d 370, 377 (7th Cir. 1985)); see also UNC Lear Services, Inc. v. Kingdom of Saudi Arabia, 720 F. Supp. 2d 800, 802-03 (W.D. Tex.

---

[66]See Plaintiff's Response to Petrotrin's Motion, Docket Entry No. 17, p. 17.

[67]See id. at 18.

2010).  Courts "rarely find that a nation has waived its sovereign immunity without strong evidence that this is what the foreign state intended."  Rodriguez, 8 F.3d at 287 (citation omitted).

The Contract does not contain an arbitration agreement.  The Contract states that it is governed by the laws of T & T.[68]  Petrotrin has not filed any responsive pleadings without raising its immunity defense.  Therefore, none of the three recognized implicit waiver situations exists here.

> The Contract paragraph Sarkar relies on states in full:

> You are required to comply with the Tax Laws of Trinidad and Tobago and the United States of America.  Should you be required to pay additional taxes in the United States arising from your taxation under Trinidad and Tobago Laws in relation to this contract, the Company shall pay to you such additional amount.[69]

Sarkar argues, "[w]hile it is true the obligation is primarily placed on Sarkar, by virtue of the compliance requirements, Petrotrin itself contractually agreed to cooperate in good faith to allow Sarkar to comply with US laws . . . ."[70]

A reference to an American citizen's obligation to comply with United States tax laws in a contract explicitly governed by the laws of another country does not fit the narrowly construed limits

---

[68]"This letter-agreement will be interpreted and take effect in accordance with the laws of Trinidad and Tobago."  Contract, Exhibit 1 to Amended Complaint, Docket Entry No. 12-1, p. 3.

[69]See id. at 2 ¶ 7.

[70]See Plaintiff's Response to Petrotrin's Motion, Docket Entry No. 17, p. 18.

of the implied waiver clause of § 1605(a)(1).  For example, in
Mendenhall v. Saudi Aramco, 991 F. Supp. 856, 858 (S.D. Tex. 1998),
the plaintiff argued that Saudi Aramco implicitly waived its
sovereign immunity because of its extensive business dealings in
the United States, its participation in ERISA, its submission to
the tax authority of the United States, and its employment of
American educated Saudi Arabian citizens and American citizens.
The court held that the plaintiff's argument had "no basis in law
when viewed in light of authority regarding waiver under the FSIA."
Id.[71]  "Simply put, business dealings within the United States, at
least to the extent alleged by Plaintiff, do not implicitly waive
sovereign immunity."  Id.; see also Good v. Aramco Services Co.,
971 F. Supp. 254, 261 (S.D. Tex. 1997) ("Plaintiffs do not argue
that one of the three examples in the legislative history applies
here.  Rather, . . . [Plaintiffs] contend that Saudi Aramco has
implicitly waived the immunity by including in its Articles
provisions for representation of officers and directors in lawsuits
brought against them in their official capacity and for
indemnification of expenses incurred by them by reason of such
lawsuits.  Such provisions are not inconsistent with sovereign

---

[71]Citing as examples:  Shapiro v. Republic of Bolivia, 930 F.2d
1013, 1017 (2d Cir. 1991); Foremost-McKesson, Inc. v. Islamic
Republic of Iran, 905 F.2d 438, 444 (D.C. Cir. 1990); Joseph v.
Office of the Consulate General of Nigeria, 830 F.2d 1018, 1022-23
(9th Cir. 1987); Frolova, 761 F.2d at 377.

immunity. There is no provision in the Articles expressly stating that Saudi Aramco is subject to suit in the United States.").

Sarkar has not presented "strong evidence" that Petrotrin intended to waive its sovereign immunity, especially since the Contract is expressly governed by T & T law.[72] See Af-Cap, Inc. v. Republic of Congo, 462 F.3d 417, 426-27 (5th Cir. 2006) ("If this Court wanted to go outside of the three ordinary circumstances, it must still 'narrowly construe' the implicit waiver clause of § 1605(a)(1). In the case at hand, there is no evidence, and certainly no strong evidence, that the Congo implicitly waived immunity to suit in Texas." (citation omitted)); In re Tamimi, 176 F.3d 274, 279 (4th Cir. 1999) (citing Rodriquez, 8 F.3d at 287). The court concludes that Petrotrin did not implicitly waive its sovereign immunity.

## C.    Commercial Activity

"The FSIA identifies three types of acts which are sufficiently connected to the United States to satisfy the jurisdictional nexus requirement to the commercial activities exception[.]" Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo General del Sindicato Revolucionario de Trabajadores Petroleros de la Republica Mexicana, S.C., 923 F.2d 380, 386 (5th Cir. 1991). A foreign state shall not be immune from the

---

[72]Similarly, simultaneously listing Sarkar's compensation in terms of T & T and U.S. dollars does not indicate implicit consent to jurisdiction in Texas.

jurisdiction of courts of the United States or of the States in any case in which the action is based:  (1) upon a commercial activity carried on in the United States by the foreign state; or (2) upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or (3) upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.][73]  See 28 U.S.C. § 1605(a)(2); OBB Personenverkehr AG, 136 S. Ct. at 394 n.1.  "'Commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act.  The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d); see Republic of Argentina v. Weltover, Inc., 112 S. Ct. 2160, 2165-67 (1992).

"In order to decide whether the commercial activity exception applies, first, the relevant activity must be identified. . . . Second, the court must determine if the relevant activity is sovereign or commercial. . . . Finally, if the relevant activity is commercial in nature, the court must determine whether it had the requisite jurisdictional nexus with the United States [pursuant

---

[73]Sarkar argues that each of the commercial activities upon which his claims are based "comports with 2 (if not 3) of the prongs of the commercial activity exception . . . ."  Plaintiff's Response to Petrotrin's Motion, Docket Entry No. 17, pp. 12-13.

to § 1605(a)(2)]." Can-Am International, LLC v. Republic of Trinidad and Tobago, 169 F. App'x 396, 404 (5th Cir. 2006) (unpublished). Since Petrotrin does not dispute that its relevant conduct constitutes "commercial activity,"[74] the court's analysis will focus on the acts that form the basis of Sarkar's claims and whether those acts have a sufficient jurisdictional nexus.

The court begins by identifying the particular conduct on which the plaintiff's action is based. See OBB Personenverkehr AG, 136 S. Ct. at 395 (quoting Nelson, 113 S. Ct. at 1477). The Supreme Court has rejected a "one-element test" that would require "a court to identify all the elements of each claim in a complaint before that court may reject those claims for falling outside § 1605(a)(2)." Id. at 396. "[T]he mere fact that the [defendant's act] would establish a single element of a claim is insufficient to demonstrate that the claim is 'based upon' that [act] for purposes of § 1605(a)(2)." Id. at 395. Thus, a court must focus on the core of the suit — the foreign sovereign's acts that actually injured the plaintiff — rather than individually analyzing each cause of action. Id. at 396.

A foreign sovereign "does not abrogate its sovereign immunity simply because it conducts commercial operations that have a connection with the United States. Not only must there be a jurisdictional nexus between the United States and the commercial

_____

[74]See Petrotrin's Motion to Dismiss, Docket Entry No. 13, p. 13 n.4.

acts of the foreign sovereign, there must be a connection between the plaintiff's cause of action and the commercial acts of the foreign sovereign." <u>Stena Rederi AB</u>, 923 F.2d at 386-87 (citations omitted).  "[T]he connection between the cause of action and the sovereign's commercial acts in the United States must be *material*. Isolated or unrelated commercial actions by a foreign sovereign in the United States are insufficient to support a commercial activities exception to sovereign immunity." <u>Id.</u> at 387.

Sarkar asserts breach of contract, negligent misrepresentation, and negligence claims against Petrotrin.  Sarkar contends that the commercial activities upon which his claims are based are: "(1) failure to make the termination payment required under the Contract to Sarkar in his US bank account, which had a direct effect in the United States much like the payment obligation in the <u>Weltover</u> decision; and (2) the actions related to recruitment, hiring, negotiation, and employment taken by the Defendants and Plaintiff that occurred in the US and that related to commercial activity in the US and/or T&T as more fully specified in [¶¶ 11-26, 28 of the Amended Complaint]."[75]  Petrotrin argues that the "gravamen" of Sarkar's claims is that Defendants failed to properly seek a work permit for Sarkar, "acts that took place wholly outside the United States."[76]

_____

[75]<u>See</u> Plaintiff's Response to Petrotrin's Motion, Docket Entry No. 17, p. 13.

[76]<u>See</u> Petrotrin's Motion to Dismiss, Docket Entry No. 13, pp. 13-14.

Sarkar's claims are based upon Petrotrin's acts[77] in seeking to hire him for the Vice President Marketing position and the negotiations and communications between Sarkar and Petrotrin, including communications regarding the work permit application process and status.   However, the court will not consider "[i]solated or unrelated commercial actions of a foreign sovereign in the United States," which are "insufficient to support a commercial activities exception to sovereign immunity."   Stena Rederi AB, 923 F.2d at 387 (citations omitted).   Not all of the facts alleged in the Amended Complaint have a material connection to Sarkar's claims.

The fact that Petrotrin sells petroleum products in the United States (or enters into joint ventures here or secures financing here) is irrelevant to Sarkar's claims.   See, e.g., United States v. Moats, 961 F.2d 1198, 1205 (5th Cir. 1992) ("[T]he fact that Pemex routinely carries on some portion of its oil exploration and production activities in the United States is not enough to support jurisdiction. Rather, *this lawsuit* must be based on commercial activities that are connected to the United States in the manner described by the statute." (citation omitted)); see also Stena Rederi AB, 923 F.2d at 387.   Likewise, this action is not

---

[77]Petrotrin argues that Sarkar did not establish that HRC acted as Petrotrin's agent.   See id. at 18. The Amended Complaint generally alleges that HRC was Petrotrin's agent.   See Docket Entry No. 12, p. 2 ¶ 4; p. 3 ¶ 10.   Sarkar does not address Petrotrin's argument.   Assuming, without deciding, that HRC acted as Petrotrin's agent in engaging Sarkar, the outcome is not different.

based upon Petrotrin or HRC's actions in recruiting for the CFO position because that has no connection to the causes of action pleaded.  See Moats, 961 F.2d at 1205-06 (refusing to consider activities connected to the original contracts in a suit for the breach of a settlement agreement).

Sarkar's claims are not based on Sarkar's Texas dinner with Ronald Huff, who met with Sarkar before Huff began working for Petrotrin in T & T as CFO.[78]  Although Huff had already been hired by Petrotrin, Sarkar does not allege that this conversation was authorized by Petrotrin or that Huff was acting as Petrotrin's agent.[79]  See Dale v. Colagiovanni, 443 F.3d 425, 428-29 (5th Cir. 2006) (holding an agent acting only with apparent authority is "insufficient to trigger the commercial activity exception" because the commercial activity must be that "of the foreign state"); Allfreight Worldwide Cargo, Inc. v. Ethiopian Airlines Enterprise, 307 F. App'x 721, 724-25 (4th Cir. 2009).[80]

---

[78]See Huff Declaration, Exhibit B to Petrotrin's Motion to Dismiss, Docket Entry No. 13-3, pp. 2-3 ¶¶ 3, 6.  The fact that Rajkumar met with Huff on a trip to Texas for Rajkumar's cancer treatment and discussed the CFO position is also not material to Sarkar's claims.  See Amended Complaint, Docket Entry No. 12, p. 5 ¶ 19; Rajkumar Declaration, Exhibit A to HRC's Motion to Dismiss, Docket Entry No. 14-2, p. 5 ¶¶ 17-18.

[79]See Huff Declaration, Exhibit B to Petrotrin's Motion to Dismiss, Docket Entry No. 13-3, p. 3 ¶ 7; see also Adharsingh Declaration, Exhibit A to Petrotrin's Motion to Dismiss, Docket Entry No. 13-2, p. 4 ¶ 10.  An HRC employee sent an email intro-ducing Sarkar to Huff as the incoming Vice President Marketing and Huff to Sarkar as the incoming CFO.  See Exhibit 8 to Plaintiff's Response to Petrotrin's Motion, Docket Entry No. 17-8, p. 2.

[80]Sarkar does not otherwise allege that anyone from Petrotrin or HRC met with him in Texas.  See Soudavar v. Islamic Republic of
(continued...)

Next, the court must decide whether a "substantial connection" exists between the relevant commercial activity by Petrotrin and the United States. See Can-Am, 169 F. App'x at 405; Nelson, 113 S. Ct. at 1477. Sarkar first argues that Petrotrin's failure to make the Termination Payment has a direct effect on the United States, although based on commercial activity outside of the United States, under the third clause of 28 U.S.C. § 1605(a)(2).[81] Sarkar relies on Weltover, 112 S. Ct. 2160, and Voest-Alpine Trading USA Corp. v. Bank of China, 142 F.3d 887 (5th Cir. 1998).

In Weltover, 112 S. Ct. 2163-64, creditors issued Argentinian government bonds that were to be paid in U.S. dollars through transfer on the London, Frankfurt, Zurich, or New York market at the election of the creditor. When Argentina failed to pay as required and attempted to unilaterally reschedule the maturity dates on the bonds, the bondholders sued for breach of contract in the Southern District of New York. Id. Because the plaintiffs relied on the third clause of § 1605(a)(2), the Court considered "whether this lawsuit is (1) 'based . . . upon an act outside the territory of the United States'; (2) that was taken 'in connection

---

[80](...continued)
Iran, 186 F.3d 671, 674 (5th Cir. 1999) (single visit of Iranian official does not constitute substantial contact with the United States); see also id. ("In Stena, [923 F.2d at 389 n.11,] we concluded that a single visit to Texas by a representative of a nationalized Mexican petroleum company did not constitute substantial contact with the United States.").

[81]See Plaintiff's Response to Petrotrin's Motion, Docket Entry No. 17, pp. 13-16.

with a commercial activity' of Argentina outside this country; and (3) that 'cause[d] a direct effect in the United States.'" Id. After deciding Argentina engaged in "commercial" activity, the Court held that Argentina's unilateral rescheduling of the maturity dates had a "direct effect" in the United States "[b]ecause New York was thus the place of performance for Argentina's ultimate contractual obligations." Id. at 2166, 2168.

In Voest-Alpine, 142 F.3d at 893, the Bank of China failed to pay on a letter of credit to the Texas bank account specified by the plaintiff. The Fifth Circuit discussed Weltover and held that "a financial loss incurred in the United States by an American plaintiff, if it is an immediate consequence of the defendant's activity, constitutes a direct effect sufficient to support jurisdiction under the third clause of the commercial activity exception to the FSIA." Id. at 897. It held that "the Bank of China's failure to pay on the letter of credit caused a direct effect in the United States, that is, Voest-Alpine's nonreceipt of funds in its Texas bank account followed as an 'immediate consequence' of the Bank of China's actions." Id. at 896.

A "direct" effect is one that "follows as an immediate consequence of the defendant's . . . activity" and is not "too remote and attenuated." See Weltover, 112 S. Ct. at 2168. Here, there is not the direct effect found in Weltover and Voest-Alpine. "The focus of extant jurisprudence [on the direct effect prong] has been on the breach of performance due in the United States."

-26-

Energy Allied International Corp. v. Petroleum Oil & Gas Corp. of
South Africa, No. H-08-2387, 2009 WL 2923035, at *4 (S.D. Tex.
Sept. 4, 2009) (internal citations omitted).  Sarkar does not deny
that Petrotrin was generally to pay Sarkar in a T & T bank account,
but alleges that he "intended to regularly transfer his salary and
other compensation payments back to his US bank accounts" and
"intended to receive the termination payment . . . directly to the
US (by way of wire transfer to his US bank account)."[82]  Sarkar's
unilateral intention to transfer his compensation to the
United States from Trinidad is not a commercial act by Petrotrin,
so it cannot be considered for these purposes.

Sarkar argues that because he was not able to leave the
United States to work in T & T, "Petrotrin was aware that payment
could only be received by Sarkar in the United States at a bank
account located in the US."[83]  Sarkar points out that "after [he]
attempted to negotiate some workaround for his work permit process,
he engaged counsel to make a demand for the above-termination
payment — and such demand squarely required that Petrotrin contact
his US counsel for payment instructions for this termination
payment."[84]  Thus, Sarkar argues, "the failure by Petrotrin to make

---

[82]See Amended Complaint, Docket Entry No. 12, p. 6 ¶ 24.
Sarkar's Declaration does not mention these intentions, and Sarkar
has not provided evidence that the Termination Payment would be
made to his United States bank account if it were to become due.

[83]See Plaintiff's Response to Petrotrin's Motion, Docket Entry
No. 17, p. 15.

[84]Id.

the contractually required payment to Sarkar to his US bank account had a direct effect upon the United States, namely a huge financial loss suffered by Sarkar on direct result of Petrotrin's actions (the unilateral termination of the Contract)."[85]  These facts are distinguishable from those in <u>Voest-Alpine</u> and <u>Weltover</u>.  The Contract does not state that the Termination Payment will be made to a United States bank, while in <u>Voest-Alpine</u>, 142 F.3d at 896, "the Bank of China conceded at oral argument, when the necessary documents are conforming, it is the Bank's customary practice to send payments on a letter of credit to wherever the presenting party specifies.  In other words, had the Bank of China not found it necessary to refuse payment, it would have wired the money directly to Voest-Alpine's Texas bank account."  In <u>Weltover</u>, 112 S. Ct. at 2164, the plaintiffs designated their U.S. bank accounts as the place of payment pursuant to a contractual option.  Sarkar does not argue that the Contract gives him the right to designate a place of payment.[86]  Performance under Sarkar's Contract was contemplated to take place in T & T and to be governed by the laws of T & T.

---

[85]<u>Id.</u>

[86]The Amended Complaint, Docket Entry No. 12, p. 6 ¶ 24; p. 12 ¶ 48, states that "Plaintiff intended to receive the termination payment payable by Petrotrin upon termination of the Contract (and as more fully described in paragraphs 39, 48, and 64 below) directly to the US (by way of wire transfer to his US bank account)." and "After terminating the Contract, Petrotrin has refused to pay the Termination Payment to Plaintiff (which would be payable at this time by wire transfer to Plaintiff's US bank account)."

In <u>Can-Am</u>, 169 F. App'x at 398-99, the court examined arguments similar to Sarkar's arguments.  Sorsby, the founder and CEO of Can-AM (an LLC registered in Texas) marketed her services as a financial consultant to Trinidad and Tobago and the Tobago House of Assembly, and the parties entered a memorandum of understanding. <u>See</u> <u>id.</u> Sorsby's responsibilities included: "introducing different financing structures to the THA for government review and selection; arranging the funding institution subject to THA approval; providing contractual arrangements with program managers of trading groups acceptable to the THA; negotiating interest rates, if required, payable on the funds held in T&T's account, subject to the approval of the THA; arranging for the profits generated by the financing program to go into a THA trust account; working with the THA to arrange collateral, if required, for the financing program selected by the THA; and investigating and arranging the lowest interest rates, if required, for the THA's selection and approval."  <u>Id.</u> at 399.  In turn, the THA's responsibilities included: "providing the most feasible and high priority projects for financing; getting all the necessary government approvals to implement the financing program selected by the THA from those submitted by Sorsby; executing all documents necessary to implement the selected financing program; and arranging all necessary government collateral as required."  <u>Id.</u>

Can-Am argued that the third prong "direct effect" exception applied:  "'the [Appellees'] breach caused a direct effect on the

United States' because Sorsby, an American citizen and CEO of an American company, expected to be compensated for her work in the United States." Id. at 407. The only direct effect Can-Am claimed was the financial loss to Sorsby. Id. Discussing Weltover, the Fifth Circuit upheld the district court's dismissal for want of jurisdiction because

> Can-Am's losses in pursuit of an acceptable investment opportunity for the Appellees are not enough to meet this prong of the commercial activity exception. Even if Can-Am did provide evidence of its financial losses, this prong still would not be met. It is undisputed that neither T & T nor the THA ever transferred money in connection with any alleged investment opportunity identified by Can-Am; hence, the type of activity found to be commercial in Weltover and other cases is absent here. Can-Am's alleged financial loss in the United States in and of itself is not enough to meet this prong of the commercial activity exception.

Id. at 408; see also Weltover, 112 S. Ct. at 2168. Other courts have held there is no "direct effect" in circumstances similar to Sarkar's. See, e.g., Peterson v. Royal Kingdom of Saudi Arabia, 416 F.3d 83, 91 (D.C. Cir. 2005) (finding no direct effect where foreign state "might well have paid [plaintiff] in the United States but it might just as well have done so outside the United States") (internal citations and quotations omitted); Energy Allied International Corp., 2009 WL 2923035, at *4 ("Financial hardship . . . is too vague a basis for a direct effect . . . ."); see also id. (describing Peterson, 416 F.3d at 91, as holding "performance not necessarily due in United States, so no direct

-30-

effect").[87]   The fact that the termination payment would possibly
be paid via wire transfer to the United States is insufficient to
confer jurisdiction.[88]   The acts or "intent" by Sarkar to send money
to the United States or to receive money in the United States is
not "commercial activity" by Petrotrin.   For these reasons, the
court concludes that the third clause of the commercial activity
exception does not apply here.

Sarkar briefly argues that Petrotrin's recruiting and hiring
process for him involved acts taken inside the US to further
commercial activity overseas, fitting within the first clause of
§ 1605(a)(2).[89]   The Amended Complaint provides a few specific

---

[87]The fact that Sarkar engaged counsel in the United States to
make a demand for the payment is also not "commercial activity" by
Petrotrin.

[88]See Amended Complaint, Docket Entry No. 12, p. 6 ¶ 24; p. 10
¶ 39 (describing when Petrotrin would "owe Plaintiff" the
Termination Payment, but not where it would be paid); p. 12 ¶ 48
("After terminating the Contract, Petrotrin has refused to pay the
Termination Payment to Plaintiff (which would be payable at this
time by wire transfer to Plaintiff's US bank account)."); p. 16
¶ 64 (arguing that the Termination Payment is due because
"Petrotrin unilaterally terminated the Contract").   See also
Plaintiff's Response to Petrotrin's Motion, Docket Entry No. 17,
pp. 13-14.

[89]See Plaintiff's Response to Petrotrin's Motion, Docket Entry
No. 17, pp. 16-17.   The Amended Complaint, Docket Entry No. 12,
p. 3 ¶ 9, states: "With respect to the acts or omissions here at
issue, Defendant Petrotrin, at all times, was engaged in a
commercial activity in Texas within the meaning of 28 USC
§ 1605(a)(2)."   Thus, the second clause of § 1605(a)(2) does not
apply here.   "Because the first clause permits jurisdiction based
on 'commercial' acts in the United States, the second clause is
generally understood to apply to noncommercial acts in the
United States that relate to commercial acts abroad."
(continued...)

-31-

instances where Petrotrin contacted Sarkar while he was allegedly in the United States, but sometimes conflates Petrotrin and HRC.[90] Sarkar's declaration states generally:  "I subsequently engaged in discussions and negotiations with Petrotrin and HRC regarding my position and contract with Petrotrin.  Most of the time, I was in Texas when communicating with HRC and Petrotrin."[91]   Sarkar also

---

[89](...continued)
Voest-Alpine, 142 F.3d at 892 n.5 (citing Nelson, 113 S. Ct. at 1478).   Since Petrotrin's activities were undisputedly "commercial," the court need not consider the second clause of § 1605(a)(2).  See id. at 892 ("[B]ecause all of the [defendant's] acts and activities relevant to this case are indisputably 'commercial' in nature, the second clause is inapplicable.").

[90]See Amended Complaint, Docket Entry No. 12, p. 4 ¶ 16; p. 5 ¶¶ 18, 21; p. 6 ¶ 23; p. 10 ¶ 37.

[91]See Sarkar Declaration, Exhibit 1 to Plaintiff's Response to Petrotrin's Motion, Docket Entry No. 17-1, p. 1 ¶ 5.  Besides this general allegation, Sarkar does not state that he was located in the United States when he received or sent any email in this chain. Sarkar's Exhibits 1-8 are attached to both of Sarkar's responses; Exhibit 9 is only attached to the response to Petrotrin's motion. Exhibit 1: Sarkar Declaration; Exhibit 2: December 4, 2014, email from Sarwan Khairah, one of Sarkar's references, to Kelly Rajack at HRC; Exhibit 3: September 27, 2015, email from Sarkar (forwarded by Kelly Rajack at HRC to Rajkumar at HRC) discussing "Revised contract"; Exhibit 4: September 27, 2015, email from Sarkar (forwarded by Rajkumar at HRC to Rajack at HRC) discussing Sarkar's housing preferences; Exhibit 5: February 1, 2015, email from Sarkar to Rajkumar discussing the work permit denial (including a draft letter addressed to Hassanali at Petrotrin); Exhibit 6: Trinidad Ministry of National Security Guidelines for submitting applications for Work Permits for Non-nationals; Exhibit 7: January 2, 2015, email from Rajack at HRC to Rajkumar at HRC discussing a request for a copy of the ad[vertisement] placed for the Vice President Marketing position to be used in the application package for Sarkar's work permit (admitting that HRC did not place an "AD" for the position "as we had already made contact with Mr. Sarkar during the CFO search"); Exhibit 8: January 8, 2015, emails between Rajack (introducing Huff and Sarkar), Huff, and
(continued...)

-32-

generally alleges that HRC acted as Petrotrin's agent, but does not provide support for that allegation.[92]

Regardless, Petrotrin's and HRC's communications with Sarkar while he was in the United States were minimal:  a few emails, a few phone calls, and one letter.[93]  In <u>Tubular Inspectors, Inc. v. Petroleos Mexicanos</u>, 977 F.2d 180, 182, 185–86 (5th Cir. 1992), the Fifth Circuit rejected the applicability of the first clause of the commercial activity exception to the plaintiff's tort and contract claims.  The court held that a foreign state that addressed a purchasing order jointly to American and Mexican subsidiaries, inspected and approved the ordered goods in Houston, and received and paid invoices that were sent by the American and Mexican subsidiaries did not trigger the commercial activity exception in a lawsuit over unpaid invoices.[94]  <u>Id.</u> at 184–86.[95]

---

[91](...continued)
Sarkar, discussing Sarkar and Huff meeting before Huff flies to T & T; Exhibit 9: January 7, 2015, email from Sarkar to Hassanali, thanking Hassanali for "taking into consideration joining Petrotrin as a consultant till the work permit approval arrives."

[92]<u>See</u> Amended Complaint, Docket Entry No. 12, p. 2 ¶ 4; p. 3 ¶ 10; p. 8 ¶ 32; p. 9 ¶ 36.  HRC asserts that "HRC is an independent contractor over which Petrotrin has no day-to-day control.  HRC and Petrotrin do not share employees."  Adharsingh Declaration, Exhibit A to Petrotrin's Motion, Docket Entry No. 13-2, p. 3 ¶ 5.

[93]<u>See</u> Adharsingh Declaration, Exhibit A to Petrotrin's Motion, Docket Entry No. 13-2, p. 2 ¶ 6.

[94]Sarkar also argues that his offer to work as a consultant from T & T and the United States was accepted, which constitutes acts taken in the US relating to commercial activity in T & T, and
(continued...)

Having identified the relevant commercial activity, the court concludes that it does not have the "requisite jurisdictional nexus with the United States." Can-Am, 169 F. App'x at 404. Petrotrin's few alleged communications with Sarkar are not "commercial activity carried on in the United States" with "substantial contact" with Texas (to the extent that Sarkar's claims are even based upon those communications). See 28 U.S.C. §§ 1603(3), 1605(a)(2). As

---

[94](...continued)
arguably to conducting commercial activity in the United States itself. See Plaintiff's Response to Petrotrin's Motion, Docket Entry No. 17, p. 16.

[95]In Stena Rederi AB, 923 F.2d at 389, the court noted that "[i]f the district court had concluded that Captain Mendez Cid's visit to Brownsville was an act in the United States in connection with foreign commercial activity sufficient to confer jurisdiction under the FSIA, this Court might have been obligated to affirm the district court's exercise of jurisdiction over [Plaintiff's] negligent misrepresentation claim. It is apparent, however, that the district court did not reach such a conclusion. The record is entirely devoid of any suggestion that a Captain Mendez Cid made wrongful statements on Pemex's behalf in Brownsville, Texas." In a footnote, the court continued: "Stena argued in its sworn complaint that the commercial activities exception in the FSIA precluded Pemex's claim of sovereign immunity. The complaint, however, makes absolutely no reference to a Captain Mendez Cid. Indeed, the complaint suggests that one Ramon Betteta in Sweden made the statements that induced Stena to mobilize the STENA SEAHORSE. The record contains no evidence and reveals no affidavits that would tend to verify the Brownsville visit of Captain Mendez Cid. The only mention of Captain Mendez Cid in the record is a sentence in Plaintiff's Response to Pemex's Motions to Dismiss for Want of Subject Matter, Personal Jurisdiction and Under the Doctrine of Forum Non Conveniens to the effect that Captain Mendez Cid inspected the STENA SEAHORSE in the Texas port. Significantly, the plaintiff's response did not expressly contend that Captain Mendez Cid himself provided any false information to Stena officials." Here, Rajkumar (who is not an employee of Petrotrin) allegedly misrepresented the work permit application status in T & T. See Amended Complaint, Docket Entry No. 12, p. 13 ¶ 50. See also note 124, infra.

-34-

discussed above, the court cannot consider other isolated or unrelated contacts with Texas by Petrotrin.  Because Petrotrin is a foreign sovereign and Sarkar has not produced facts establishing that an exception to sovereign immunity applies, the FSIA requires the court to grant Petrotrin's Motion to Dismiss.  See generally Can-Am, 169 F. App'x 396.

## IV.  HRC's Motion to Dismiss

HRC argues that the court should dismiss the Amended Complaint because the court lacks personal jurisdiction over HRC.[96]  Sarkar responds that this court does have specific personal jurisdiction over HRC because HRC directly contacted/recruited Sarkar knowing he was in Texas, which also resulted in HRC's negligent acts.[97]

### A.  Standard of Review

The plaintiff bears the burden of establishing the court's jurisdiction over the defendant.  See Colwell Realty Investments, Inc. v. Triple T Inns of Arizona, Inc., 785 F.2d 1330, 1332 (5th Cir. 1986).  When the court decides the defendant's motion to

---

[96]See HRC's Motion to Dismiss, Docket Entry No. 14, pp. 5-11; HRC's Reply in Support, Docket Entry No. 19, pp. 7-19.  HRC also argues for dismissal pursuant to forum non conveniens, but as the court concludes that it lacks personal jurisdiction over HRC, it does not reach this argument.  See id. at 16-18.

[97]See Plaintiff's Response to Defendant HRC Associates Limited's Motion to Dismiss ("Plaintiff's Response to HRC's Motion"), Docket Entry No. 16, pp. 3, 7-10.  Sarkar alternatively requests that the court sever any causes of action and/or parties so that the appropriate claims/parties subject to this court's jurisdiction may proceed here.  See id. at 11.

dismiss without an evidentiary hearing, the plaintiff meets its burden by presenting a prima facie case for personal jurisdiction. Id. at 1333.   The court may examine the complaint, affidavits, interrogatories, depositions, oral testimony, or any combination of recognized discovery methods.   Id.   Uncontroverted allegations in the complaint must be taken as true, and any conflicts in the evidence must be resolved in favor of the plaintiff.   See id.; American Film & Printing, Ltd. v. Cowart Mulch Products, Inc., No. 3:15-CV-0682-L-BF, 2015 WL 5836599, at *4 (N.D. Tex. July 16, 2015) (citing Bullion v. Gillespie, 895 F.2d 213, 217 (5th Cir. 1990)); Mylonakis v. M/T Georgios M., 909 F. Supp. 2d 691, 704 (S.D. Tex. 2012).   The court is not obligated to credit conclusory allegations, even if uncontroverted.   See Panda Brandywine Corp. v. Potomac Electric Power Co., 253 F.3d 865, 869 (5th Cir. 2001) (citations omitted).

A federal court may exercise personal jurisdiction over a nonresident defendant for claims arising under state law if the state long-arm statute confers personal jurisdiction over that defendant, and if the exercise of jurisdiction is consistent with due process under the United States Constitution.   Ruston Gas Turbines, Inc. v. Donaldson Co., Inc., 9 F.3d 415, 418 (5th Cir. 1993).   The Texas long-arm statute extends personal jurisdiction to the constitutionally permissible limits of due process.   Aviles v. Kunkle, 978 F.2d 201, 204 (5th Cir. 1992) (citations omitted).[98]

---

[98]See generally Tex. Civ. Prac. & Rem. Code Ann. Chap. 17, Subchapter C (Long-Arm Jurisdiction in Suit on Business Transaction or Tort).

Therefore, the court "need only inquire whether the assertion of jurisdiction over [the nonresident defendant] by a district court sitting in Texas would be constitutionally permissible." Stuart v. Spademan, 772 F.2d 1185, 1189 (5th Cir. 1985). This is the "due process" inquiry. See id.

In conducting the due process inquiry, the court must determine (1) that the defendant has established "minimum contacts" with the forum state; and (2) that the exercise of personal jurisdiction over the defendant does not offend "traditional notions of fair play and substantial justice." Ruston Gas, 9 F.3d at 418 (citing International Shoe Co. v. State of Washington, Office of Unemployment Compensation and Placement, 66 S. Ct. 154, 158 (1945)); Stuart, 772 F.2d at 1189. The "minimum contacts" prong itself is divided into two types of personal jurisdiction: general or specific. See Ruston Gas, 9 F.3d at 418; Daimler AG v. Bauman, 134 S. Ct. 746, 751 (2014) (citing Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846 (2011)); McFadin v. Gerber, 587 F.3d 753, 759 (5th Cir. 2009).

B.   **Analysis**

1.   Specific Jurisdiction

"Specific jurisdiction . . . depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation. In contrast to

general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" Goodyear, 131 S. Ct. at 2851 (citations omitted; see also Ruston Gas, 9 F.3d at 418-19 ("A state exercises 'specific jurisdiction' over a non-resident defendant when the lawsuit arises from or relates to the defendant's contact with the forum state. A single act by the defendant directed at the forum state, therefore, can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." (citations omitted)). Specific jurisdiction "focuses on the relationship among the defendant, the forum, and the litigation." Monkton Insurance Services, Ltd. v. Ritter, 768 F.3d 429, 432-33 (5th Cir. 2014) (citing Walden v. Fiore, 134 S. Ct. 1115, 1121 (2014)). Specific personal jurisdiction is a claim-specific inquiry. McFadin, 587 F.3d at 759 ("A plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim." (quoting Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266 (5th Cir. 2006)).

The specific jurisdiction inquiry consists of three steps:

(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

Seiferth, 472 F.3d at 271 (citations omitted).  If the plaintiff successfully satisfies the first two steps, the burden shifts to the defendant to defeat jurisdiction by showing that its exercise would be unfair or unreasonable.  Id. (citation omitted).

HRC's alleged contacts with Texas include initiating the communications with Sarkar regarding the Vice President Marketing position, calling and emailing Sarkar while Sarkar was in Texas, and contacting one of Sarkar's references who was in Texas.[99] Sarkar was also in Texas when he signed the Contract.[100]  Sarkar asserts two claims against HRC.[101]  As described by Sarkar:  "The first claim is for negligence based on HRC's failure to follow the proper procedure in applying for the work permit. . . . HRC has already admitted that it did not post an advertisement for Sarkar's position, as required by the work permit application process.  The second claim is for negligent misrepresentation based on HRC's representation to Sarkar that the work permit process was just a formality."[102]

---

[99]See Plaintiff's Response to HRC's Motion, Docket Entry No. 16, p. 3; Sarkar Declaration, Exhibit 1 to Plaintiff's Response to HRC's Motion, Docket Entry No. 16-1, p. 1 ¶¶ 3, 5; emails re: Sanjoy Sarkar Reference Check between Kelly Rajack, Technical Associate at HRC Associates, and Sarwan Khairah, Exhibit 2 to Plaintiff's Response to HRC's Motion, Docket Entry No. 16-2.

[100]The Contract is with Petrotrin, not HRC; and Sarkar asserts his breach of contract claim only against Petrotrin.  See Amended Complaint, Docket Entry No. 12, pp. 15-16.

[101]See Amended Complaint, Docket Entry No. 12, pp. 17-20.

[102]See Plaintiff's Response to HRC's Motion, Docket Entry No. 16, p. 8 (citations omitted).

HRC has twelve employees and one office, all located in
T & T.[103]   It does not own, lease, or control any real estate in
Texas and does not have a license to conduct business in Texas or
a registered agent for service of process in Texas.[104]   HRC does not
pay taxes or own a bank account in Texas.[105]   HRC has never
contracted with anyone in Texas and has never had employees,
servants, or agents in Texas.[106]   HRC's "recruiting activity" in
Texas consists solely of internet job postings via LinkedIn, which
are viewable worldwide and to which it occasionally receives
responses from Texas residents.[107]   It has never filed a lawsuit in
Texas or been sued in Texas, with the exception of this action.[108]

Sarkar points out that HRC contacted him regarding the open
Vice President Marketing position and that he would not have known
about the position otherwise.[109]   However, HRC contacted Sarkar

_____

[103]See Rajkumar Declaration, Exhibit A to HRC's Motion to
Dismiss, Docket Entry No. 14-2, p. 2 ¶ 3.   Recruiting accounts for
less than half of HRC's business.   Id.

[104]See id. at 3 ¶ 4.

[105]See id. ¶ 6.

[106]See id. ¶ 5.

[107]See id. at 3-4 ¶¶ 7-9.   "[I]n the five years preceding
January 30, 2015, only responses from three Texas residents
(including Sarkar) have led to follow-up discussions with HRC."   Id.
at 3 ¶ 7.

[108]See id. at 3 ¶ 6.

[109]Plaintiff's Response to HRC's Motion, Docket Entry No. 16,
p. 3; Sarkar Declaration, Exhibit 1 to Plaintiff's Response to
HRC's Motion, Docket Entry No. 16-1, p. 1 ¶ 3.   "The court must
(continued...)

-40-

because it already had his resume and other materials from his prior response to a LinkedIn internet post advertising the CEO position.[110]  No HRC employee traveled to Texas or anywhere in the United States to meet with Sarkar, and all meetings between HRC and Sarkar occurred in T & T.[111]  Sarkar interviewed for the Vice President Marketing job in T & T.[112]  HRC engaged in several email and telephone communications with Sarkar regarding his employment and move to T & T.[113]  Most of these occurred while Sarkar was in

---

[109] (...continued)
accept as true the uncontroverted allegations in the plaintiff's complaint and must resolve in favor of the plaintiff any factual conflicts." Mylonakis, 909 F. Supp. 2d at 704.  However, Sarkar's affidavit and Response to HRC's Motion do not deny that Sarkar initially contacted HRC in response to a general LinkedIn advertisement for a different position at Petrotrin.  This is also consistent with the Amended Complaint, which states, "Sarkar was first contacted by HRC for the position of CFO, and when this did not come to fruition, HRC again contacted Sarkar for the position of [Vice President Marketing].  HRC made the first contact in both instances to Sarkar on behalf of Petrotrin."  Amended Complaint, Docket Entry No. 12, pp. 3-4 ¶ 12.

[110] See Rajkumar Declaration, Exhibit A to HRC's Motion to Dismiss, Docket Entry No. 14-2, p. 4 ¶¶ 10-11.

[111] Rajkumar visited Houston at various times in 2014 and 2015 for cancer treatment and met with Ronald Huff during one of these visits.  See id. at 5 ¶¶ 17-18.  At the time Huff was discussing potential employment as CFO with Petrotrin, but Rajkumar avers that "[t]his was a courtesy meeting and not an interview."  Id. Regardless, Rajkumar's meeting with another person regarding a different position for Petrotrin does not relate to Sarkar's negligent misrepresentation and negligence claims against HRC.

[112] See Adharsingh Declaration, Exhibit B to HRC's Motion to Dismiss, Docket Entry No. 14-3, p. 3 ¶ 7.

[113] See note 91 supra.  See also Rajkumar Declaration, Exhibit A to HRC's Motion to Dismiss, Docket Entry No. 14-2, pp. 4-5 ¶ 14. Generally, communications initiated by the plaintiff cannot be
(continued...)

Texas.[114]   HRC and Petrotrin represented that Texas was a strong market area of focus during Sarkar's interview process and contacted one of Sarkar's references who was located in Texas.[115] HRC collected some of the material from Sarkar that Petrotrin submitted with the work permit application to the T & T government, but Petrotrin submitted the paperwork.[116]   Sarkar sent an email in early December of 2014 discussing potential contract revisions and issues relating to U.S. dollars and tax returns.[117]   In December of 2014 Sarkar sent an email stating that he would "start work with Petrotrin from January 19th 2015" and discussing his family's housing needs.[118]

---

[113](...continued)
considered.  Monkton, 768 F.3d at 431-33 (multiple phone calls and wire transfers between a Texas resident plaintiff and a foreign defendant were "initiated by [the Texas resident and his company] and are thus insufficient to confer jurisdiction").

[114]See Sarkar Declaration, Exhibit 1 to Plaintiff's Response to HRC's Motion, Docket Entry No. 16-1, p. 1 ¶ 5.

[115]See id. ¶ 4; emails re: Sanjoy Sarkar Reference Check between Kelly Rajack, Technical Associate at HRC Associates, and Sarwan Khairah, Exhibit 2 to Plaintiff's Response to HRC's Motion, Docket Entry No. 16-2.

[116]See Rajkumar Declaration, Exhibit A to HRC's Motion to Dismiss, Docket Entry No. 14-2, p. 4 ¶ 12.

[117]See September 27, 2015, email from Sarkar (forwarded by Kelly Rajack at HRC to Rajkumar at HRC) discussing "Revised contract," Exhibit 3 to Plaintiff's Response to HRC's Motion, Docket Entry No. 16-3.

[118]See September 27, 2015, email from Sarkar (forwarded by Rajkumar at HRC to Rajack at HRC) discussing Sarkar's housing preferences, Exhibit 4 to Plaintiff's Response to HRC's Motion, Docket Entry No. 16-4.

Sarkar alleges that he underwent "significant personal, professional, and financial changes because of both Petrotrin's and HRC's representations relating to his anticipated work/employment with Petrotrin."[119] "Sarkar resigned from his job, gave notice to his daughter's school that she would be leaving (in the middle of the school year), and informed his business contacts about his move."[120] Sarkar argues that "these changes had a direct and immediate impact in Texas – not Trinidad & Tobago – and on Sarkar's family, professional, and financial life."[121]

While these circumstances undoubtedly impacted the Sarkar family greatly, a plaintiff's actions in the forum state — resigning from a job, informing a school of a transfer, informing colleagues of an impending work opportunity — cannot be imputed to HRC. The plaintiff's own contacts with the forum cannot be used to demonstrate contacts by the defendant. Monkton, 768 F.3d at 433

---

[119]See Plaintiff's Response to HRC's Motion, Docket Entry No. 16, p. 4.

[120]See id. (citing Sarkar Declaration, Exhibit 1 to Plaintiff's Response to HRC's Motion, Docket Entry No. 16-1, pp. 1-2 ¶ 7; February 1, 2015, email from Sarkar to Rajkumar discussing the work permit denial (including a draft letter addressed to Hassanali at Petrotrin), Exhibit 5 to Plaintiff's Response to HRC's Motion, Docket Entry No. 16-5).

[121]See id. Sarkar also states that "[w]itnesses and documented evidence that can verify these changes are located in Texas." However, "[d]ue process limits on the State's adjudicative authority principally protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties." Walden, 134 S. Ct. at 1122 (citing World-Wide Volkswagen Corp. v. Woodson, 100 S. Ct. 559, 564 (1980)).

(citing <u>Walden</u>, 134 S. Ct. at 1122).[122]  "Moreover, a plaintiff's
unilateral activities in Texas do not constitute minimum contacts
where the defendant did not perform any of its obligations in
Texas, the contract did not require performance in Texas, and the
contract is centered outside of Texas." <u>Moncrief Oil International</u>
<u>Inc. v. OAO Gazprom</u>, 481 F.3d 309, 312 (5th Cir. 2007) (citing
<u>Hydrokinetics, Inc. v. Alaska Mechanical, Inc.</u>, 700 F.2d 1026, 1029
(5th Cir. 1983)).  As the Supreme Court described:

> First, the relationship must arise out of contacts that
> the "defendant himself" creates with the forum State.  We
> have consistently rejected attempts to satisfy the
> defendant-focused "minimum contacts" inquiry by
> demonstrating contacts between the plaintiff (or third
> parties) and the forum State. . . .  Put simply, however
> significant the plaintiff's contacts with the forum may
> be, those contacts cannot be "decisive in determining
> whether the defendant's due process rights are violated."
> Second, our "minimum contacts" analysis looks to the
> defendant's contacts with the forum State itself, not the
> defendant's contacts with persons who reside there.

<u>Walden</u>, 134 S. Ct. at 1122.

Although one contact can satisfy the test for specific
jurisdiction, the court can only consider the contacts that give
rise to Sarkar's claims.  <u>See</u> <u>Ruston Gas</u>, 9 F.3d at 418-19;
<u>Goodyear</u>, 131 S. Ct. at 2851.  Sarkar argues that "HRC's admitted
misrepresentation to [him] that the work permit process was just a

---

[122]Sarkar's other factual statements focus on the
United States, not Texas specifically.  For example, Sarkar
understood that his compensation was tied to the U.S. dollar and
that he would have to pay U.S. taxes and comply with U.S. laws.
This is not relevant here because HRC was not a party to the
Contract and Sarkar is not asserting a breach of contract claim
against HRC.

'formality' resulted in Sarkar taking actions and making statements that had a direct and immediate impact in Texas."[123]  Rajkumar avers that the only time he mentioned that the work permit application process was a "formality" was verbally to Sarkar in T & T.[124] Despite knowing that not placing an advertisement for the Vice President Marketing position[125] was a problem for the work permit application, six days later HRC confirmed via email that Sarkar was

-------------

[123]See Plaintiff's Response to HRC's Motion, Docket Entry No. 16, p. 4; Rajkumar Declaration, Exhibit A to HRC's Motion to Dismiss, Docket Entry No. 14-2, p. 5 ¶ 15.  Sarkar alleges that he relied on this statement.  See Sarkar Declaration, Exhibit 1 to Plaintiff's Response to HRC's Motion, Docket Entry No. 16-1, p. 1 ¶ 7 ("I relied on the various representations from Petrotrin and HRC . . . [including] Rajkumar's representations to me that the work permit process was just a formality.").

[124]See Rajkumar Declaration, Exhibit A to HRC's Motion to Dismiss, Docket Entry No. 14-2, p. 5 ¶ 15.  See also Amended Complaint, Docket Entry No. 12, p. 13 ¶ 50 ("Rajkumar[] verbally communicated to Plaintiff, and Plaintiff affirmatively relied on this communication that the work permit process was a "mere formality" for prospective employees of Petrotrin.  In an email dated December 29, 2014, Rajkumar stated that the work permit would be taken care that week and that 'there was no need to worry'. Plaintiff relied on these statements.").  However, this email is not attached to any pleading, and Sarkar does not discuss it in his response.  See Morris, 721 F. Supp. 2d at 570 ("Because Morris has not alleged, and Ebert has not submitted any evidence showing that the misrepresentations for which relief was sought in this action were made in Texas, the court concludes that Olympiakos lacks minimum contacts needed to support the court's exercise of personal jurisdiction over it with respect to the fraud claims asserted here since those claims do not arise from and are not connected to Olympiakos' contacts with Texas.").

[125]See January 2, 2015, email from Rajack to Rajkumar discussing a request for a copy of the advertisement placed for the Vice President Marketing position to be used in the application package for Sarkar's work permit and admitting that HRC did not place an advertisement for the Vice President Marketing position "as we had already made contact with Mr. Sarkar during the CFO search," Exhibit 7 to Plaintiff's Response to HRC's Motion, Docket Entry No. 16-7.

"the incoming [Vice President Marketing] at Petrotrin."[126]  Sarkar argues that "with respect to the first claim for negligence, even though the actual act of submitting an improper work permit application occurred in Trinidad & Tobago, the basis for it was due to HRC's knowledge and action of reaching out to Sarkar in Texas due to his prior attempt to obtain the CFO position."[127]

The issue before the court is not whether HRC was negligent, but whether HRC has sufficient minimum contacts with Texas for the court to exercise jurisdiction over it.  Any negligence on HRC's part in failing to advertise the Vice President Marketing position, the ostensible reason T & T ultimately denied Sarkar's work permit application, occurred in T & T.  Failure to correct this or any other defect associated with the work permit application also occurred in T & T.  Similarly, Rajkumar's representation to Sarkar in T & T is not a tort committed in Texas.  In TPG Partners III, L.P. v. Kronfeld, No. 4:01-CV-0895-A, 2002 WL 1315798, at *3 (N.D. Tex. June 13, 2002), the plaintiff argued that the exercise of personal jurisdiction over the defendant was appropriate based on "several fraudulent and/or negligent misrepresentations" made to plaintiff, a Texas resident, by facsimile, telephone, and other

---

[126]See January 8, 2015, emails between Rajack (introducing Huff and Sarkar), Huff, and Sarkar, discussing Sarkar and Huff meeting before Huff flies to T & T, Exhibit 8 to Plaintiff's Response to HRC's Motion, Docket Entry No. 16-8.

[127]See Plaintiff's Response to HRC's Motion, Docket Entry No. 16, p. 9.

communications to plaintiff's Texas headquarters. The court held that personal jurisdiction did not exist for the plaintiff's negligence and negligent misrepresentation claims when the defendants never came to Texas and the plaintiff did not point out how any of the referenced emails or phone calls were fraudulent. Id. at *3-4. See also General Electric Capital Corp. v. Posey, No. 4:02-CV-319-Y, 2006 WL 708163, at *6 (N.D. Tex. Mar. 20, 2006) ("Although the board meetings that [defendant] attended were admittedly all in Texas, GECC has failed to sufficiently tie the content of those meetings or [defendant's] conduct at those meetings to the negligent misrepresentation claim against him so as to give rise to specific personal jurisdiction. There is no proof that the matters presented and discussed at the Texas board meetings or [defendant's] conduct at those meetings contributed in any way to the alleged misrepresentations about EBITDA upon which GECC relied in making the loan to ProMedCo. For these reasons, the Court concludes that GECC has failed to demonstrate, prima facie, that its lawsuit arises out of or relates to [defendant's] contacts with Texas; as a result, specific personal jurisdiction is lacking."); Memorial Hospital System v. Blue Cross and Blue Shield of Arkansas, 830 F. Supp. 968, 971-74 (S.D. Tex. 1993) ("Nonetheless, Plaintiff maintains that if an out-of-state tortfeasor such as Blue Cross knows that the brunt of the injury will be felt by a Texas resident, the tortfeasor must reasonably foresee being haled into a Texas court to answer for such

actions. . . . [N]egligently answering in Arkansas a single, long-distance telephone inquiry initiated by a Texas hospital to ascertain the availability of insurance coverage . . . would therefore not rise to the level of an act or acts by the Arkansas insurer that can be regarded as purposefully directed or aimed at Texas as a forum.").

Torts committed elsewhere do not give rise to personal jurisdiction over a defendant merely because the defendant knows of plaintiff's "strong forum connections." Walden, 134 S. Ct. at 1124. In Walden the court held that the court of appeals erred "by shifting the analytical focus of the [defendant's] contacts with the forum to his contacts with [plaintiff's]." Id. There, plaintiffs (Nevada residents) sued a DEA officer who stopped the plaintiffs at the Atlanta airport at their departure gate for Las Vegas. Id. at 1119. The officer seized $97,000 in cash on suspicion it could be related to drug transactions. Id. At some point, the officer drafted an affidavit to show probable cause for forfeiture of the money and forwarded that affidavit to a United States Attorney's office in Georgia. Id. The officer also received correspondence from the plaintiff's Nevada attorney. Id. The Court stated that "[i]t is undisputed that no part of [defendant's] course of conduct occurred in Nevada. . . . [Defendant] never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada. In short, when viewed through the proper lens—whether the defendant's

-48-

actions connect him to the forum—petitioner formed no jurisdictionally relevant contacts with Nevada." <u>Id.</u> at 1124. Rather than assessing the defendant's contacts with Nevada, the Court of Appeals erred by looking to defendant's knowledge of plaintiff's "strong forum connections," and finding that knowledge, combined with its conclusion that respondents suffered foreseeable harm in Nevada, satisfied the "minimum contacts" inquiry. <u>Id.</u> The Court held that "[t]his approach to the 'minimum contacts' analysis impermissibly allows a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." <u>Id.</u> at 1125.

Sarkar also argues that "it is established that a nonresident entity 'who recruits Texas [residents] to work in another state, either **directly** or through an agent located in Texas, is subject to the jurisdiction of Texas courts for claims arising from that recruitment.'" (quoting <u>Garcia v. Vasquez</u>, 524 F. Supp. 40, 42 (S.D. Tex. 1981) (emphasis added)).[128] Sarkar argues that the basis

---

[128]<u>See</u> Plaintiff's Response to HRC's Motion, Docket Entry No. 16, p. 9.   Generally, a defendant does not have minimum contacts with a state "when it does not have a physical presence in the state; it did not conduct business in the state; and the contract underlying the business transaction at issue in the lawsuit was not signed in the state and did not call for performance in the state." <u>Monkton</u>, 768 F.3d at 433 (citing <u>Seiferth</u>, 472 F.3d at 272); <u>see also</u> <u>Evergreen Media Holdings, LLC v. Safran Co.</u>, 68 F. Supp. 3d 664, 684 (S.D. Tex. 2014); <u>Moncrief Oil</u>, 481 F.3d at 312 ("An exchange of communications in the course of developing and carrying out a contract also does not, by itself, constitute the required purposeful availment of the benefits and protections of Texas law.   Otherwise, jurisdiction could be exercised based only on the fortuity that one of the parties happens to reside in the forum state."); <u>McFadin</u>, 587 F.3d at 759 (continued...)

for his negligence claim "was due to HRC's knowledge and action of reaching out to Sarkar in Texas due to his prior attempt to obtain the CFO position," although he admits that "the actual act of submitting an improper work permit application occurred in Trinidad."[129]

Sarkar relies on Garcia and attempts to distinguish Morris, 721 F. Supp. 2d at 566, where the court found no evidence that "when [the nonresident defendant/employer] recruited [the plaintiff] through [the plaintiff's] Massachusetts-based agents, that [the nonresident defendant/employer] knew or had reason to know that it was recruiting a Texas resident."[130]  In Morris the court stated that "Garcia stands for the principle that a nonresident farmer who recruits Texas laborers to work in another state, either directly or through an agent located in Texas, is subject to the jurisdiction of Texas courts for claims arising from

---

[128](...continued)
(holding that communications relating to the performance of a contract themselves are insufficient to establish minimum contacts and noting that "jurisdiction must not be based on the fortuity of one party residing in the forum state") (citing Freudensprung v. Offshore Technical Services, Inc., 379 F.3d 327, 344 (5th Cir. 2004)).  HRC's email and phone communications with Sarkar, "most" of which occurred while he was in Texas, rested on nothing but the mere fortuity that Sarkar happens to be a resident of Texas.  Holt Oil & Gas Corp. v. Harvey, 801 F.2d 773, 778 (5th Cir. 1986) (citing Patterson v. Dietze, Inc., 764 F.2d 1145, 1147 (5th Cir. 1985)); Aviles, 978 F.2d at 205 (collecting cases discussing communication to a Texas resident by a nonresident defendant).

[129]See Plaintiff's Response to HRC's Motion, Docket Entry No. 16, p. 9.

[130]See id. at 7.

that recruitment." Id. at 565 (citation omitted).   The court
distinguished Garcia:

> Garcia, 524 F. Supp. at 40, is distinguishable from this
> case because there the request for laborers was not only
> communicated to and distributed by the Texas-based TEC,
> but the plaintiffs spoke by telephone to the TEC in
> Texas, and during that telephone conversation the TEC
> communicated to the plaintiffs the terms and conditions
> of employment pursuant to which the plaintiffs agreed to
> work in North Carolina.   Moreover, the claims that the
> plaintiffs asserted in the lawsuit were claims for breach
> of the terms and conditions of employment that the TEC
> communicated to them during their telephone call to
> Texas.   Here, there is no evidence that Olympiakos used
> any Texas-based entity to recruit Morris to work in
> Greece. . . .   Ebert has not cited any evidence showing
> that before Morris spoke on the telephone with Liveratos
> and agreed to play basketball for Olympiakos, i.e., when
> Olympiakos recruited Morris through Morris'
> Massachusetts-based agents, that Olympiakos knew or had
> reason to know that it was recruiting a Texas resident.

Morris, 721 F. Supp. 2d at 565-66 (citations omitted).

In Morris the court also distinguished other cases where
courts had found "the exercise of specific jurisdiction comport[ed]
with the requirements of due process." Morris, 721 F. Supp. 2d at
566.   These cases are distinguishable because Sarkar's claims arise
out of subsequent allegedly negligent acts by HRC in T & T.   In
other cases the claims included breach of contract and were against
the employer who entered the contract with the plaintiff.   See,
e.g., Runnels v. TMSI Contractors, Inc., 764 F.2d 417, 417-18, 423
(5th Cir. 1985); Dotson v. Fluor Corp., 492 F. Supp. 313, 314-17
(W.D. Tex. 1980).   Other cases cited in Morris are also
distinguishable.   In Clark v. Moran Towing & Transportation Co.,
Inc., 738 F. Supp. 1023, 1029-30 (E.D. La. 1990), and Runnels, 764

F.2d at 417-18, the defendant advertised directly in the forum
state by placing advertisements in local newspapers.  In Dotson,
492 F. Supp. at 314-17, the defendant used an agent authorized to
do business in Texas to recruit Texas employees to work overseas by
placing advertisements in a Texas newspaper.  In Gonsalez Moreno
v. Milk Train, Inc., 182 F. Supp. 2d 590, 594 (W.D. Tex. 2002), the
defendant contacted a farm labor service to recruit Texas residents
for migrant farm employment in New York, provided the farm labor
service with the terms and conditions of employment, paid the farm
labor service a fee for each migrant worker provided, hired
plaintiffs as a result of the farm labor service's recruitment in
Texas, paid plaintiffs' bus fare to New York, and allowed
plaintiffs to sign their employment contracts in Texas.

In Aviles, 978 F.2d at 203, the Fifth Circuit held that the
district court should not have exercised specific personal
jurisdiction over defendants.

> The district court found the assertion of specific
> personal jurisdiction over the defendants to be proper
> because of the partial performance of a contract in Texas
> [n.4  "The district court concluded that the communica-
> tion from defendants' agent regarding start date,
> plaintiffs' preparation for the trip, and at least some
> of the journey to Ohio constituted part performance of a
> contract in Texas."], the partial commission of a tort in
> Texas [n.5  "The district court found that the misrepre-
> sentation by defendants' agent in the telephone
> communication and the letter regarding the start date of
> the harvest constituted a tort committed partially in
> Texas."], and the recruitment of Texas residents in Texas
> for employment outside the state.  Such actions can in
> some cases provide the requisite minimum contacts
> permitting a court to exercise personal jurisdiction over
> a nonresident defendant, but only if the asserted cause

of action arises out of these "contacts." In the case at
bar, however, plaintiffs' cause of action is not based
upon any contract, tort, or recruitment in Texas, but
upon the alleged violation of two federal statutes
arising solely out of their employment in Ohio.

Id. at 204-05 (citations omitted). See also Baker Hughes v. Homa,

Civil Action No. H-11-3757, 2013 WL 5775636, *1, *5, *9, *17-19

(S.D. Tex. Oct. 25, 2013) ("Even assuming that NBG Holding sent the

email to Norton for the purpose of trying to recruit him to work

for NBG Holding, that email by itself would be insufficient to

establish minimum contacts with Texas.  A telephone call to a

potential recruit from a prospective employer is insufficient to

establish minimum contacts in the recruit's state." (citing Morris,

721 F. Supp. 2d at 560)).

HRC initially had no reason to know it was recruiting a Texas

resident when it advertised the CFO position in a post accessible

worldwide on LinkedIn.[131]  Although HRC knew Sarkar was a Texas

resident when it reached out to him regarding the Vice President

_____

[131]See Rajkumar Declaration, Exhibit A to HRC's Motion to
Dismiss, Docket Entry No. 14-2, p. 3 ¶ 7; p. 4 ¶ 10.  In Aviles,
978 F.2d at 205, the "district court also found that certain of
plaintiffs had accepted employment for Kunkle Farms' 1983 cucumber
and tomato harvests while still in Ohio following the 1982 harvest.
Defendants' only contact with Texas was one telephone call and one
letter which merely advised plaintiffs of the start date of the
employment which they had already accepted the previous summer in
Ohio."  The Fifth Circuit held that "[t]his limited contact alone
is insufficient to allow the exercise of specific personal
jurisdiction in this case." Id.  HRC does not recruit in Texas or
anywhere in the United States often; it primarily recruits T & T
residents for positions in T & T, and has never had an employee
visit the United States for business. See Rajkumar Declaration,
Exhibit A to HRC's Motion to Dismiss, Docket Entry No. 14-2,
pp. 3-4 ¶¶ 7-9.

Marketing position, Sarkar's negligence claim is not related to that contact.  As Sarkar admits, the acts of negligence occurred in T & T,[132] as did Rajkumar's representation.  Sarkar has not established the requisite minimum contacts between HRC and Texas that give rise to his claims against HRC so as to allow this court to properly exercise personal jurisdiction over HRC.  See Mylonakis, 909 F. Supp. 2d at 707.

2.  General Jurisdiction

In the Amended Complaint Sarkar appears to allege alternatively that this court has general personal jurisdiction over HRC.[133]  For a corporation, "the place of incorporation and principal place of business are paradigm bases for general jurisdiction."  Daimler AG, 134 S. Ct. at 760 (quotations, modifications, and citations omitted).  General jurisdiction may

---

[132]See Plaintiff's Response to HRC's Motion, Docket Entry No. 16, p. 8.

[133]See Amended Complaint, Docket Entry No. 12, p. 3 ("Allegations of Jurisdiction — Petrotrin's and HRC's Specific Contacts with Plaintiff"); p. 8 ("Allegations of Jurisdiction — Petrotrin's and HRC's General Contact with the United States").  The court will address general jurisdiction briefly because Sarkar's response only discusses specific jurisdiction.  See Plaintiff's Response to HRC's Motion, Docket Entry No. 16, p. 3.  Sarkar's response does argue that "[f]or all intents and purposes, the only significant issues that would involve discovery concerns Sarkar's damages that occurred in Texas."  Id. at 8-9; 4.  That is irrelevant to the personal jurisdiction analysis.  Walden, 134 S. Ct. at 1122 ("However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts' with that State that are a prerequisite to its exercise of power over him") (quoting Hanson v. Denckla, 78 S. Ct. 1228, 1238 (1958)).

exist over a corporation otherwise, however:  "a court may assert jurisdiction over a foreign corporation 'to hear any and all claims against [it]' only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive 'as to render [it] essentially at home in the forum State.'"  Id. at 751 (quoting Goodyear, 131 S. Ct. at 2851).

HRC was formed under the laws of T & T and has its principal place of business there.[134]  HRC's contacts with Texas, discussed above, are minimal.  The Fifth Circuit rejected a general jurisdiction argument based on similarly tenuous contacts in Monkton, 768 F.3d at 431-32.  There, the plaintiff argued that the defendant's contacts with Texas "through its website, telephone conversations with [the plaintiff], and wire transfers to Texas banks" were enough to justify the exercise of general jurisdiction. Id.  The court found that the defendant bank, incorporated and with its principal place of business in the Cayman Islands, was not "at home" in Texas.  Id. at 432.

HRC does not conduct business in Texas, maintain an office in Texas, employ anyone in Texas, or maintain an agent for service of process in Texas.  See, e.g., Johnston v. Multidata Systems International Corp., 523 F.3d 602, 614 (5th Cir. 2008) ("We do not believe that these various activities amount to substantial,

---

[134]See Amended Complaint, Docket Entry No. 12, p. 2 ¶ 4; Rajkumar Declaration, Exhibit A to HRC's Motion to Dismiss, Docket Entry No. 14-2, p. 2 ¶ 3.

systematic, and continuous contacts.  MDS Canada is not registered to do business in Texas; does not own, possess or use property in Texas; does not maintain a mailing address or bank account in Texas; and does not keep, maintain or store any documents within Texas.  While it is true that MDS Canada sells products and services to Texas customers, neither the total amount of sales nor the percentage of annual sales is substantial or regular enough to create a general presence in Texas.").  HRC's affiliations with Texas are not "so 'continuos and systematic' as to render [HRC] essentially at home in Texas."  See Daimler AG, 134 S. Ct. at 761 (citing Goodyear, 131 S. Ct. at 2851).[135]  Therefore, the court concludes that HRC does not have sufficient minimum contacts with Texas to give rise to specific or general jurisdiction.  See Monkton, 768 F.3d at 430 (citing Latshaw v. Johnston, 167 F.3d 208, 211 (5th Cir. 1999)).

## V.  Conclusions and Order

For the reasons stated above, this court lacks jurisdiction over Defendants.  Therefore, Defendant Petroleum Company of

---

[135]HRC also argues that Texas jurisdiction would be unreasonable because it would impose a significant burden on HRC, an alien defendant, and the assertion of jurisdiction would interfere with T & T policies.  See HRC's Motion to Dismiss, Docket Entry No. 14, pp. 14-16.  Because the court concludes that neither specific nor general jurisdiction exists to satisfy the minimum contacts prong, it is not necessary to examine the "traditional notions of fair play and substantial justice" prong.  See Ruston Gas, 9 F.3d at 418-19.

Trinidad and Tobago Limited's Motion to Dismiss Sanjoy Sarkar's Amended Complaint (Docket Entry No. 13) is **GRANTED** and Defendant HRC Associates Limited's Motion to Dismiss Sanjoy Sarkar's Amended Complaint (Docket Entry No. 14) is **GRANTED**, and this action will be dismissed for lack of jurisdiction.[136]

SIGNED at Houston, Texas, on this the 23rd day of June, 2016.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE

---

[136]Sarkar's alternative request to sever the cases against each Defendant is rendered moot by this Memorandum Opinion and Order. See Plaintiff's Response to Petrotrin's Motion, Docket Entry No. 17, pp. 22-23; Plaintiff's Response to HRC's Motion, Docket Entry No. 16, p. 11.